## INGERSOLL *v.* HOLT.

---

PATENTS; INTERFERENCE.

1. Where one party to an interference adduces no testimony in support of the statements contained in his preliminary statement, such statements will not be considered except in so far as they are corroborated by the testimony offered by the other party; and he must be limited to the date of his original application as that of his conception and reduction to practice.
2. Where one of the parties to an interference testifies that it was his idea that went into a model and that he directed the other party to make the model, and such testimony is corroborated, the failure of the latter to testify in his own behalf or to offer evidence to contradict his rival's testimony, will be deemed to be practically conclusive corroboration of his rival's statement.

No. 134. Patent Appeals. Submitted November 15, 1899. Decided December 14, 1899.

HEARING on an appeal from a decision of the Commis-

sioner of Patents in an interference proceeding.   *Affirmed.*

The facts are sufficiently stated in the opinion.

*Mr. Milton A. Wheaton* and *Mr. L. S. Bacon* for the appellant.

*Mr. T. Walter Fowler* for the appellee.

Mr. Justice MORRIS delivered the opinion of the Court:

This is an appeal from the decision of the Commissioner of Patents in an interference case.

The appellant, George W. Ingersoll, is the holder of a patent issued to him on December 25, 1894, based on an application filed on March 19, 1894; but which, on account of alleged inaccuracies in it, he desires to surrender and to have reissued to him. His application for a reissue was filed on October 12, 1895. The appellee, Benjamin Holt, is also the holder of a patent, which was issued to him on December 28, 1897, based upon an application filed on November 25, 1895, about one month and a half after the filing of Ingersoll's reissue application. It is upon this reissue application that an interference was declared between it and Holt's patent.

A previous interference, it seems, had been declared between the reissue application and Holt's application, before the latter went to a patent. But that interference was dissolved, on the ground that there was no interference in fact on the issue as then drawn, and also because there was irregularity in the declaration. Holt's application, however, was held up for some time afterwards, in view of the probability of another interference as soon as Ingersoll should get his claims into proper shape for such interference ; but, in consequence of Ingersoll's alleged dilatoriness in the amendment of his specification, Holt's application went to an issue, and his patent was granted to him. Subsequently, on March 16, 1898, the present interference was declared.

The subject matter of controversy is an invention in the

improvement of harvesters, or harvesting machines, such as are used on the vast wheatfields of California, where the invention was made and used, and where both parties to the interference resided at the time. The improvement consists in the adjustment of harvesters so as to operate on hillsides equally as on level ground ; and it is technically stated in the record in the following terms :

"A harvester consisting of a header supported substantially parallel with the ground, a thrasher mounted on a single longitudinal line of wheels, connection between the header and thrasher frames to permit them to change their positions relative to each other, and means for adjusting the thrasher relative to the header so that it may maintain a vertical position without regard to the position of the header when traveling over sloping ground."

This is the issue in the case. The header, it may be remarked, is the name given to the portion of the machine which mows down the standing grain, which it does by cutting off the heads, leaving a great part of the stalk standing; and the whole machine, which is often very large and requires upward of thirty horses to draw it, is intended to accomplish almost simultaneously the work of mowing, threshing, winnowing, and preparing the grain for market. These large harvesters are not new in the present controversy; they have been in use for several years, and previous patents relating to them have been issued both to the parties to this controversy and to other persons. The novelty in this controversy is the method of adjustment of the header and the thresher, the two principal parts of the machine, to each other in such manner as that the thresher will always remain upright, a position which it is required to maintain in order that it should perform its work properly, while the header remains parallel to the ground, whether that ground be the level plain or the slope of a hillside, which parallelism is required in order that it also may perform its work, that of cutting off the heads of the grain, effectively.

Not only did Ingersoll's original application and the issue of his patent antedate the application of Holt for a patent, but even his reissue application was prior in point of time to Holt's application. Consequently, although Holt's patent was issued to him in the meantime, while Ingersoll's reissue application was pending, yet Ingersoll remains the senior applicant, and the burden of proof is on Holt to overcome the effect of the earlier application.

When the parties were called upon for their preliminary statements, Ingersoll alleged that he had conceived the invention on or about January 15, 1892; that, on or about February 15, 1892, he had made drawings of it and explained it to others; that, in the latter part of February, 1892, he commenced work on a model, which work was continued during the winter and spring of that year; that he embodied the invention in a full sized machine, which was used for the harvest of 1894, and successfully operated in the neighborhood of Stockton, in the State of California; that the said machine had been used every year since, and that he had caused other similar machines to be manufactured for use and sale. Holt's allegation was that he had conceived the invention on or about December 4, 1893; that, on or about December 5, 1893, he had made drawings of it and explained it to others; that, on December, 6, 1893, he had instructed one of his employees to make a model of it, that employee being Ingersoll; that, on December 7, 1893, the model had been completed for him; that, in June, 1895, he commenced to build full sized machines embodying the invention; that at least one of these machines was completed on or about June 6, 1896, and that, on or about June 10, 1896, it was successfully operated at Crow's Landing, in the State of California.

Holt, the junior applicant, upon whom rested the burden of proof, took testimony in support of his claim, which testimony consisted of his own deposition, the depositions of eight employees of the firm of Holt Brothers or the Holt

Manufacturing Company, by which the Holt machine was manufactured, and of which firm or company the appellee, Benjamin Holt, seems to have been the most active member; and the deposition of one other person. These nine witnesses appear to have fully corroborated Holt in his statements, and, in fact Holt's testimony is accepted on behalf of Ingersoll as entirely correct, although the deductions to be drawn from it are controverted. No testimony was taken on behalf of Ingersoll, or only the testimony of one witness in explanation merely of a drawing introduced into the case by Holt. Ingersoll, it seems, had left the State of California, where the testimony was taken, and where both parties had resided, and had gone to the State of Michigan. But this fact is not given as a reason for not taking his testimony. It is admitted by counsel for him that they are satisfied with the testimony of Holt; and it is argued on behalf of Ingersoll that Holt proves Ingersoll's case.

By the failure of Ingersoll to offer any proof of the allegations contained in his preliminary statement, these allegations passed out of the case, except in so far as they may have been corroborated, if corroborated at all, by the testimony of Holt; and he must rely on the date of his original application, March 19, 1894, as that of his conception of the invention, and its reduction to practice, if he was in fact the inventor.

Upon the testimony, the examiner of interferences, the board of examiners in chief, and the Commissioner of Patents all concurred in awarding priority of invention to Holt; and, from the decision of the Commissioner, Ingersoll has appealed to this court.

The very able arguments and elaborate briefs of counsel in this case have made it quite manifest that the substance of the case lies within very narrow compass. As already stated, leaving out of consideration one witness on behalf Ingersoll to a comparatively unimportant matter, the only

testimony is that taken on behalf of Holt; and the facts stated by Holt in his deposition, fully corroborated as they are by the other witnesses, are conceded by counsel for Ingersoll to be correctly and truly stated. The controversy is only as to the inferences to be drawn from these statements. It is contended on behalf of Ingersoll that Holt himself proves Ingersoll's case; while a conclusion quite the reverse is maintained on behalf of Holt.

The parties, it seems, had business relations with each other. Ingersoll, for a time, and perhaps on two or more several occasions, was in the employment of Holt, or of the Holt Manufacturing Company, which practically means the same thing; although the nature of the employment is not very distinctly defined in the testimony; and he seems to have had general freedom of access to all parts of Holt's business establishment. Both were inventors in the same line of harvesters, antecedent to the invention now in issue; and their inventions would appear to have been freely communicated to each other. Ingersoll was the agent of Holt to make the model in which the latter claims to have embodied his invention; and Holt had seen and examined previous inventions of Ingersoll which are claimed to have entered into the construction of the model just mentioned.

There are certain salient facts in the case on which the determination of the controversy mainly depends. In the first place, inasmuch as Ingersoll has adduced no testimony in support of the allegations of his preliminary statement, that statement necessarily must be omitted from our consideration, and the appellant must be limited, as he was limited in the Patent Office, to the date of March 19, 1894, which was the date of his original application, as that of his conception of the invention and its reduction to practice, unless perhaps, he is helped out in some way in this regard by Holt's testimony. In the next place, Holt's testimony shows that Holt conceived the invention and embodied it in a model in the early part of December,

1893; that the conception was then communicated to Ingersoll; and that the reduction to practice was by the making of a model (designated in the record as "Exhibit A") by Ingersoll under the direction of Holt—unless, indeed, as now argued on behalf of Ingersoll, "Exhibit A" does not show the invention in controversy, or, unless Holt, in the directions given by him to Ingersoll, applied the conceptions of the latter, and not his own. On this record, therefore, it is very clear that Holt antedated Ingersoll, if he had the invention at all at the time and under the circumstances at which he claims and testifies that he had it. The question then is: First, whether the model designated as "Exhibit A" embodies the invention in controversy; and, second, whether if it does embody that invention, the conception is that of Holt or that of Ingersoll.

As to the first question there can be no serious difficulty. Notwithstanding that it is argued on behalf of Ingersoll, that "Exhibit A" is wholly unlike the perfected machine subsequently constructed by Holt, and unlike the specification of Holt's patent, it was held by all the tribunals of the Patent Office, by the examiner of interferences, and by the board of examiners by implication, and by the Commissioner expressly, that the model "Exhibit A," although subsequently modified and improved, contained substantially all the elements of the issue. In connection with the explanations of Holt to the effect that it was not necessary to embody in the model certain features which were well known in the existing machines, there would seem to be no reasonable doubt of the substantial identity of the model with the subsequently perfected machine, and no reasonable doubt of the fact that the model was a substantial embodiment of the present issue. Defects and differences have been pointed out; and there are undoubtedly defects in the model and differences between it and the subsequent machine of Holt. We do not deem it necessary to enter into any detailed consideration of these defects and

differences; but we are unable to find that they constitute a variance between the conception of the model and the conception of the issue of the interference. In that regard we fully concur with the Commissioner in the conclusion reached by him, and hold that model " Exhibit A," in connection with the disclosures of Holt at the time at which it was made, and in connection with the state of the art at that time, was a fair embodiment of the invention.

The more important question, however, is whether it was Ingersoll's ideas or those of Holt, that went into that model. Holt testifies that they were his ideas; that he directed Ingersoll how to make the model, and that Ingersoll did make it in accordance with his suggestions. In this his witnesses corroborate him, and there is no testimony whatever to the contrary. The most powerful corroboration, however, and the most potent testimony on behalf of Holt is the fact of Ingersoll's silence at that time. If, when Holt communicated his ideas to Ingersoll, as he says he did, and as we must assume he did, which went into the model, why did not Ingersoll then claim them as his own, if they were in fact his own? Why did he not protest against their appropriation by Holt to himself? For his failure so to do the record offers no reason or excuse of any kind. The rule then applies, which was laid down by the Supreme Court of the United States in the case of *Atlantic Works* v. *Brady*, 107 U. S. 192; *The Telephone Cases*, 126 U. S. 1, 562, 567, and elsewhere, that a person who is silent when he should have spoken, shall not afterward be heard to deny that which by his conduct he has affirmed. Ingersoll has had full opportunity to explain this silence and his conduct in the premises, and he has not availed himself of that opportunity. Moreover, he had a partner or associate in the transaction, one Herman Tesch, a blacksmith in the employment of Holt at the time at which the model was made, and who subsequently became the assignee of a one-half interest in Ingersoll's patent, and the application for

its reissue now put in interference.    Holt, it seems, explained his ideas to Tesch before they were communicated to Ingersoll; and Tesch, who at the time was urging Holt to build a machine upon a model designed by Ingersoll and himself for the same general purpose, but which Holt regarded as impracticable and refused to build, remarked, upon the explanation to him by Holt of his (Holt's) own ideas, that he thought Holt had the right ideas, and requested that Holt would let Ingersoll build the model, as he was a good workman and a good mechanic, and understood how to make models.    And yet Tesch was not called, any more than was Ingersoll himself, to give any account of the transaction.    Assuredly, if it was Ingersoll's ideas and not Holt's that went into the model "Exhibit A," both Ingersoll and Tesch could easily have so testified.    That they did not attempt to do so, and that it was not sought in any manner to contradict Holt's statement in this regard, is most persuasive proof that the statement is correct.    And that neither of them, at the time of the making of the model or at the time of the communication of Holt's ideas to them, asserted any right of Ingersoll to the conception, makes it reasonably certain that Ingersoll was not entitled to advance any such claim.

We do not deem it necessary to take into consideration the previous or subsequent transactions of Ingersoll.    His previous conceptions embodied in a model, designated in the record, as the "Webster" model, is not connected with the issue in this interference, and is not shown to involve this issue.    Holt states that that he saw it, regarded it as impracticable, and refused to build a machine in accordance with it.    This was the subject matter of conversation between Holt and Tesch, when the former communicated his own ideas to the latter, as already stated, which resulted in the construction of the model " Exhibit A" by Ingersoll for Holt.    Nor is it of any importance that late in 1894, long after the making of "Exhibit A," but

before the construction of any full sized machine by Holt for himself upon the lines of his own conception, Holt saw a full sized machine constructed by Ingersoll tested by actual operation in the harvest field. The testimony fails to connect that machine satisfactorily with the issue of this interference. But even if that machine did embody the issue of this interference, as long as the testimony of Holt in regard to the making of "Exhibit A" remains unimpugned, it would only show that Ingersoll borrowed Holt's ideas for his own machine. It is argued, however, that Holt was silent on that occasion, and that he should have protested against Ingersoll's appropriation of his (Holt's) conception, if the conception was in fact his own. And the same rule is invoked against him which we have heretofore stated as applicable to Ingersoll in the matter of the construction of "Exhibit A." But it is not at all apparent that the circumstances were similar, or that there was any obligation upon Holt to speak at that time. It is not shown that he saw this machine in the presence of Ingersoll or Tesch, or of any one, to whom he could well protest. The fact would seem to be, however, that Holt regarded this machine as very different from his own conception, and that there was a patentable difference, as indicated by the action of the Patent Office in granting patents to both, and to each severally for his own device and invention. It is to be inferred that the two patents do not conflict with each other, and that the interference arises only when, in the application for a reissue, Ingersoll seeks to broaden the claims of his original patent. This is not said with any reference to the rule that it is not competent in applications for reissue so to broaden the claims of the original specification as to interfere with intervening rights; for that rule does not apply in the present case; but it is said as an additional indication that the machine of Ingersoll, exhibited in the latter part of the year 1894, was substantially different from Holt's conception and invention. In fact, the two

patents may be regarded as having been granted for specific devices, not conflicting with each other; while the issue of the present interference would indicate a broader or more generic claim than either.

From what we have said it follows, in our opinion, that, upon the record before us, the Commissioner of Patents was entirely right in his decision; and we think that his decision should be affirmed, and that judgment of priority of invention should be awarded to the appellee, Holt.

The clerk of the court will certify this opinion and the proceedings in the cause in this court to the Commissioner of Patents, according to law. *And it is so ordered.*

The Chief Justice did not sit during the hearing of this case.