## GENERAL ELECTRIC CO. v. BUTLER LIGHT, HEAT & MOTOR CO.

### (District Court, W. D. Pennsylvania. April 18, 1913.)

### No. 45, November Term, 1902.

1. PATENTS (§ 83*)—VALIDITY—DELAY AND LACHES.

   A patentee, as shown by an affidavit filed by him in the Patent Office, conceived his invention, which related to a system of electric distribution, in 1879. In 1885 he applied for a patent, which, after rejections, was finally granted in 1902. In 1903 a suit for its infringement was commenced, but was not brought to a hearing for 10 years thereafter. During the preceding 33 years many others had independently made and perfected devices along the same lines, which were in extensive use. *Held*, that there was such lack of diligence and laches on the part of the patentee and his assignees as rendered the patent invalid.

   [Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 108, 109; Dec. Dig. § 83.*]

2. PATENTS (§ 328*)—SYSTEM OF ELECTRIC DISTRIBUTION.

   The Thomson patent, No. 698,156, for a system of electric distribution, *held* invalid for lack of patentability, novelty, or invention, and also by reason of the patentee's delay and laches.

3. WORDS AND PHRASES—"ORDINARILY TERMED."

   What is "ordinarily termed" is termed "by established rules and settled methods."

In Equity. Suit by the General Electric Company against the Butler Light, Heat & Motor Company. On final hearing. Decree for defendant.

Frederick P. Fish, of Boston, Mass. (Joseph Lyons, of Schenectady, N. Y., on the brief), for complainant.

Clifton V. Edwards and Lawrence K. Sager, both of New York City (S. S. Mehard, of Pittsburgh, Pa., on the brief), for defendant.

ORR, District Judge. Ten years has elapsed since this patent suit was instituted in this court. It is now before the court for final hearing upon bill, answer, replication, and proofs. At its inception two patents were involved; now one only is in controversy. The application for the letters patent in suit was filed in the Patent Office of the United States on November 2, 1885. In a period little short of 17 years—that is to say, on April 22, 1902—there was granted to Elihu Thomson (as assignor), in pursuance of said application, letters patent of the United States No. 698,156 for a "system of electric distribution." The defenses are invalidity by reason of prior publications and prior use, by reason of lack of patentable novelty or invention, and by reason of the patentee's delay and laches.

It is proper to quote from the specification enough to show to what the system relates, what is its object, and of what it consists, as follows:

"My present invention relates to means whereby electricity generated at a station and conveyed over mains or distributing circuits may be utilized at different points through the intervention of induction coils in local circuits, each of which may be supplied with currents induced by the action of current on the main and of any desired strength or electromotive force for each different local circuit."

"The object of the invention is principally to permit the employment of currents of comparatively high potential upon the mains leading from the supply station and the utilization of the electric energy of the main in electric energy of lower potential in different local circuits, without, however, interrupting the continuity in any way of the electric main leading from the central station."

"My invention consists in a novel system of electric supply, comprising in combination electric mains or supply conductors furnished from a suitable supply station with alternating or reverse currents of comparatively high potential, induction coils, or other suitable means for inductively transforming the alternating currents into induced currents on local circuits; said induction coils being placed with their primaries connected at intervals to the mains, so as to be in multiple arc with one another in relation to said mains, and secondary coils or circuits connected to local circuits and properly proportioned to obtain the desired induced electric energy for operating electric lights, motors, or other electric translating devices."

The claims of the patent are:

"1. In a system of electric distribution, a series of secondary circuits of induction coils supplying arc lights or other devices, the primary coils of which induction coils are multiple arc branches of a single primary circuit, or set of mains *A*, *B*, through which alternating or reversed currents are flowing, as described.

"2. In a system of electric distribution, a set of mains *A*, *B*, supplied by alternating currents, or alternating electrical impulses, rendering said mains alternately positive and negative with respect to each other, in combination with branch circuits taken from said mains at convenient points, and finally carried through the primary wires or coils of a set or series of induction coils, the secondaries of which are connected to electric lamps, or other apparatus, for utilizing the impulses, generated in said secondaries by induction from the said primaries.

"3. In a system of electric distribution, the combination with the high potential mains, through which alternating or reversed currents are flowing, of electric converters or reducers connected in multiple between said mains, and incandescent lamps or other translating devices supplied from said reducers with currents of lower tension and greater quantity than those circulating in the main circuit coil of the converter."

Before distinguishing these claims, it must be observed that all the elements thereof were not new. That induction coils were well known and were of different forms appears from Thomson's own statement in his specification that:

"The form of induction coil used in the practice of my invention is of little consequence, provided it insure a good economy between the primary and the secondary circuits. A very good form is described in British patent to Varley, No. 3,059, of 1856."

An ordinary induction coil is nothing but an iron core with two independent windings of copper wire placed upon it. Through one of these windings an intermittent direct current or an alternating current passes directly from the source of supply. This winding is called the "primary coil." When the current is passing through the primary wire, there is generated or induced in the other wire, called the "secondary coil," an alternating current of a different voltage to be used in the various translating devices. It is doubtful whether the force in the core which carries the induction of the current is understood or can be explained in the present state of the art. Induction coils have been called "secondary generators" and are now more often called "transformers." They may be constructed so that there may be a

higher voltage in the primary current than in the secondary current, or they may be so constructed that there may be a higher voltage in the secondary current than in the primary. The former is called a "step-down transformer"; the latter, a "step-up transformer." As an element of the claims, induction coils, therefore, must be considered old in the art.

There was nothing new in causing alternating or reversed currents to flow through a primary wire or circuit. Thomson in his specification expressly refused to limit himself to any form of generator which will produce such currents and said:

"This, however, is a matter well understood in electric engineering and need not here be more fully specified."

There was nothing new in the multiple arc branches or connections according to the specification of Thomson. He says:

"Connected to the mains *A, B,* at various points and where desired, and in circuit from one main to the other, are the smaller tap or branch or tap wires *a b c d e f g h,* forming what is ordinarily termed a 'multiple arc connection' from one main to the other."

[3] What is "ordinarily termed" is termed by "established rules or settled method." See Webster's Dictionary.

In addition to absence of disclosure as to construction of the induction coils and of the apparatus to generate the current in the primary wire, there is also no disclosure in the patent as to the construction of the lamps or other translating devices.

Referring again to the claims, it is observed that there is little if any difference between 1 and 2. The latter includes *branch* circuits from the primary circuit. Neither requires the tension of the current in the primary to be lowered or raised in the secondary. Claim 3 differs from the others in contemplating the use of step-down transformers. The patent in suit rests fundamentally upon the connections of the primary coils of transformers in multiple to the supply main of a reversed or alternating current circuit. If the patent be sustained, almost all lighting systems and the major part of the industry of the country, to the extent to which electricity is necessarily used therein, would be monopolized by the plaintiff. So useful and valuable is the system described and claimed by Thomson that he ought to give some satisfactory reason for the delay of 27 years from the date of his application to the time of testing the validity of the patent on final hearing in this court.

An examination of the file wrapper and contents shows claims 1 and 2 as they are to-day. They were rejected by the examiner May 31, 1887, as having been anticipated by United States patent to Brush No. 219,209, dated September 2, 1879. Thomson made no claim, or even suggestion, that his claims 1 and 2 were not disclosed by the Brush patent. After a further rejection on the same reference August 17, 1887, Thomson next, February 5, 1889, made an affidavit that prior to May 16, 1879, he had actually constructed and organized the system described in his application. It is fair to conclude that his delay in filing this affidavit was because of delay in ordering the interference to which the affidavit entitled him to become a party. But it is im-

portant to note the date given by him, as it is the date of the Brush application.

It would unduly prolong this opinion to note all the steps in the interference proceeding. On August 27, 1889, it was suspended for a consideration of the question of patentability; it having been suggested by the examiner that Thomson's claims 1 and 2 had been disclosed in a French patent to Rizet, No. 132,426, August 27, 1877, and United States patent to Gordon, No. 234,770, November 30, 1880. Again Thomson does not deny that the references cited do not disclose his system, but his attorney points out that the affidavit filed by Thomson carried the date of his invention back to a date not only overcoming the Brush patent, but the two just cited. There can be no other conclusion, from his silence when he might have spoken, than that Thomson knew that the system claimed by him had been disclosed in the patents cited as references, and that he was content to rely upon his ability to antedate such disclosures by satisfactory proof that he himself was the first to reduce the invention to practice.

The conclusions arrived at by the Board of Appeals are interesting. They include, briefly, that the Brush patent, No. 219,209, of September 2, 1879, disclosed the subject of the issue; that Brush, who was a party to the proceedings by reason of an application filed March 31, 1887, for a patent covering the disclosure of his early patent, was lacking in diligence by reason of his delay of $7\frac{1}{2}$ years; that Thomson's apparatus used in 1879 was an "abandoned experiment," "until it was found for the purposes" of the interference. It is clear that the Board awarded priority to Thomson, not because he was the first to disclose the invention, but because he was the first to claim the subject-matter by his application to the Patent Office dated November 2, 1885. Thomson was given the benefit of that date, which was the earliest date which could be given to anybody. The Board recommended that the issue was not patentable to any of the parties. It is difficult to understand why the recommendations of the Board were disregarded or ignored by the special examiner, who subsequently allowed the patent.

From the evidence of Thomson in the present case it can fairly be found as a fact that his apparatus and its use by him in 1879 was nothing but an experiment, which was abandoned. He gives no sufficient explanation for not following it up promptly by practice and application for patent. His later discussions with his associate, Mr. Rice, who made drawings at the time, can fairly be found to be theoretical expressions of possibilities in the art. The great fact that between the sworn date, which justified his relation to the interference proceedings, and the date of his application for the patent in suit, he had applied for 107 other patents, all relating to the uses of electricity bears an important part in enabling the court to reach the conclusion justified by all the evidence that Thomson lacked confidence in his experiments and in his theories with regard to the system described in his patent. It was not till in September or later in 1886 that he installed the system he claims to have invented. This installation was quite limited, was used for some months only, and replaced by a di-

rect current arc lighting system. It was not until May, 1887, that an alternating current machine was built for the market by the Thomson & Houston Company, the predecessor of the plaintiff. It is fair to conclude that this disregard of the valuable system of the patent was due to Thomson, who during the entire time down to the time he testified in this suit was a principal electrician and engineer of the plaintiff and its predecessor.

[1] Thomson did not show reasonable diligence in adapting and perfecting the system claimed to be his invention, either by actual reduction to practice or by filing his application, and therefore, under the rule as stated in Automatic Weighing Machine Co. v. Pneumatic Scale Corporation, 166 Fed. 288, 92 C. C. A. 206, and the different cases therein cited, he is not entitled to a monopoly and his patent must, for that reason, if for no other, be held to be invalid.

The proofs in this case show that many others beside Thomson were experimenting and theorizing in the matter of the system of the patent, both prior and subsequent to the time when he was thus engaged. In the interference proceeding above referred to Brush, Halleck, Hunter, Freeman, and Thomson were the parties. Others had been excluded, because they were not able to offer proof of anticipation of references made by the examiners. In various publications appeared from time to time accounts of experiments and positive statements of the efficiency and regulation of the system of the patent. Some of these accounts appeared shortly before some of Thomson's disclosures to Rice and contained the information of such disclosures. In the process of development of apparatus for the application of electricity to general uses, many electrical engineers were at work both in this country and in others. The system of the patent in suit was one of the outgrowths of that development. It was the result of many trials at many places. Thomson at most did nothing above the requirements of ordinary skill, which should be found in those acquainted with the state of the art at that time. He was therefore not entitled to the patent in suit.

The court is of opinion that Thomson did not make a substantial advance by anything disclosed in his patent. What he did was no more than what others were doing, and did not amount to invention by him. Wires, transformers, lighting devices, and generating devices were being connected, in different parts of the world, in every way conceived by the scientific and practical man to produce the best results. The mere fact that he may have made connections which produced beneficial results, without there being novelty in the arrangement of the parts, must not be deemed to be invention. Atlantic Works v. Brady, 107 U. S. 192, 2 Sup. Ct. 225, 27 L. Ed. 438.

An examination of the prior art, as it is set forth in the record, results in giving support to the conclusion of the court that the patent is invalid. In 1877, the English patent to Jablochkoff, No. 1,996, disclosed a lighting system with alternating currents and induction coils, but with the coils connected in series. When we keep in mind that connection in series means connections one after another, so that the current proceeding from one terminal or pole of the generator passes

in succession from one coil to another and returns to the other terminal or pole of the generator, and that, on the other hand, connection in parallel or multiple means connections by other wires with two wires which are connected with the generator and disconnected at their other ends, on each of which two wires alternating or reversed currents are impelled both from and to the same source of supply, we conclude that the Jablochkoff patent was a valuable disclosure of everything in the system of the Thomson patent, except the multiple arc connections. These, however, Thomson appears from his specification to credit others with knowing. In 1878 United States patent No. 210,317 was issued to Fuller. The patent was a disclosure of a lighting system wherein induction coils are connected in series. However, it stated that "two small coils may be connected together parallel or in series." He contemplated the use of an alternating current.

Passing by British patents of the same year, No. 4,212 to Bright, and No. 4,611 to Edwards and Normandy, both of which disclose the use of induction coils in systems for lighting purposes, we come to British patent of 1878 to De Meritens, No. 5,257, the consideration of which has swelled the records and the briefs. After giving full consideration to all that has been urged to the contrary, the court is of the opinion that that patent embodies the idea of connecting the primary coils in parallel. This view is supported by a decision in Germany of the Imperial Supreme Court, First Civil Senate, affirming a decision of the German Patent Office in In re Patent Suit of Max Deri v. Gaulard & Gibbs, involving claims for the application of induction coils for alternating currents, etc. That court at the same time held that an article upon J. B. Fuller, published in the Telegraphic Journal of April 1, 1879, was also a disclosure of the parallel connection of the inducting coils of transformers for alternating current. The article contains statements that Fuller had proposed to use two large street mains disconnected at their outward ends; that the main current was not to do the lighting, but was to generate another current in a series of induction coils; that an alternating current was to be used; and including the statement that *the positive main was to throw off a branch wire into each building to be lighted * * * and returning to the negative main."*

Enough has been taken from the prior art as above to show the state of the art prior to the date fixed by Thomson in his affidavit in the interference proceeding. Even at that time it was to be expected by any one skilled in the art that he would use the system of the patent in suit when occasion demanded. Between that sworn date and the date of Thomson's application there was a full diagrammatic direction by Brush in his United States patent of September 2, 1879, No. 219,209, heretofore mentioned, of an alternating current lighting system of distribution wherein transformers were disclosed having their primary windings connected in parallel to the two supply mains. It was the application for this disclosure, then stated to be reserved for future patent, which brought Brush into the interference proceedings, with the result heretofore stated. While the opinion of the Board of Appeals in the interference proceedings is not controlling in

any matter, except as to priority of invention between the parties, its carefully expressed views upon the subject of disclosures are not without persuasive force. In defendant's record there appears a copy of a judgment and opinion of Mr. Justice Farwell in the English case of Rucker v. London Electric Supply Corporation, Ltd. The Brush patent No. 219,209 had been cited against the plaintiff. His Lordship said:

"The first is Brush. In this specification, the defendants rely on a drawing only, viz., Fig. 9. This figure does, in my opinion, show diagrammatically the system of distribution by parallel mains and of drawing off by transforming and using secondary circuits. As Mr. Swinburne put it: 'Fig. 9 is the diagrammatic method of representing transformers in parallel on parallel mains.' Again, Lord Kelvin said that: 'Fig. 9 shows diagrammatically with perfect clearness five transformers placed in parallel on the mains of an alternating current dynamo machine. The diagram alone, with the statement that this applies to transformers in alternating current machines, is unmistakable.' And as Lord Kelvin said: 'The problem of distribution is represented in Fig. 9, although the problem as to the size of dynamos and the method of getting electricity over a large area is not dealt with.' But I cannot see that this affects the question, when you had once arrived at the fact that parallel distribution was well known before 1885. I agree with Lord Kelvin that, given that knowledge, there was no invention in proposing to do at twenty places what was done at one."

While other patents and publications could be mentioned as disclosures of the system of the patent prior to the date of Thomson's application, the court is of the opinion that the same would but increase the length of this already extended opinion. It is sufficient to say the court finds as a fact that Thomson's system is disclosed in his patent was fully disclosed in prior patents and publications, and that for this reason also his patent is invalid.

There is one other matter that the court must touch upon. This suit lay in this court about 8 years before any steps were taken on behalf of the complainant to prepare for hearing. Two years, perhaps, were necessary to prepare the case for final hearing. Had a motion been made to dismiss the bill for want of prosecution before 1910, the motion would have been granted. No excuse for such delay was offered by complainant's solicitor. Thirty-three years from the date of the conception of an invention to the date when the inventor brings the case to trial, in which the validity of his patent is contested, seems too long. The delay in this court and the delay before filing the application support the belief that the complainant had grave doubts as to the validity of his patent for the valuable system therein disclosed, which doubts this court may help to remove.

[2] The patent is invalid by reason of prior publications and prior uses. It is invalid by reason of lack of patentability, novelty, or invention. It is invalid by reason of the patentee's delay and laches.

The bill must be dismissed, at complainant's costs. Let a decree be drawn.