### EDNA BRASS MFG. CO. v. WILTBONCO MFG. CO.

(Circuit Court of Appeals, First Circuit.  July 15, 1924.)

No. 1712.

**Patents ⚖➠328—1,036,289, for water gauge, held not infringed.**
    The Mauger patent, No. 1,036,289, for a water gauge, the essential feature of which is a single yoke, having three points of contact for fastening the parts together, *held* not infringed.

Appeal from the District Court of the United States for the District of Massachusetts; James Arnold Lowell, Judge.

Suit in equity by the Edna Brass Manufacturing Company against the Wiltbonco Manufacturing Company. Decree for defendant, and complainant appeals. Affirmed.

For opinion below, see 291 Fed. 475.

William R. Wood, of Cincinnati, Ohio, for appellant.

Laurence A. Janney, of Chicago, Ill. (Osgood H. Dowell, of Chicago, Ill., and Frederick L. Emery and Emery, Booth, Janney & Varney, all of Boston, Mass., on the brief), for appellee.

Before BINGHAM, JOHNSON, and ANDERSON, Circuit Judges.

ANDERSON, Circuit Judge.  In this suit, brought for infringement of the Mauger patent, No. 1,036,289, the defendant prevailed in the court below.

For some years prior to this controversy the plaintiff and defendant had been competing manufacturers of reflex water gauges, used with steam boilers, chiefly on boilers of locomotive engines  The pioneer invention as to such gauges was that of Klinger, patented in 1892. This patent covered a glass through which the line dividing the water from the steam was made clearly visible by making the inner face of the glass with longitudinal facets, causing a refraction of light, so that the water appeared as a black and opaque body.  But difficulties arose in providing a satisfactory holder for such glass.  Commonly, the glass was incased in a metal box, accessible to the water and steam, with an open face; the front and the back of the box being fastened together by a series of eight or ten bolts passing through the margins.  As such gauges are in use subjected to heavy pressure (some 200 pounds to the square inch), and to great variations of temperature, operating unequally upon the metal and glass, breakage of the glass, sometimes with dangerous explosions, was not uncommon.  Apart from explosion, it was obviously difficult, if not impossible, to tighten four or five bolts on each side of the incasing frame, so as to produce an entirely uniform pressure.  The bolts in such a frame would also rust, and become so set as to make it inconvenient to take the gauge apart for repair.

As a result of these and other difficulties, gauge makers have for years been experimenting on different kinds of gauge holders.  In 1919 the defendant was the owner of various patents covering invention in this field, and was putting out a commercial gauge, apparently covered by patents Nos. 1,275,927 and 1,267,643.  In 1918 or 1919, or both, the plaintiff manufactured and sold a gauge which was, or was claimed to be, an infringement on these patents.  Litigation by defendant against the plaintiff was in prospect.  Thereupon, in April, 1919, plaintiff bought the Mauger patent, issued on August 20, 1912, on an application filed March 27, 1911, and brought this suit on the theory that this patent cuts the ground from under the defendant's patents; that the defendant and not the plaintiff is the infringer. Plaintiff's general contention is that the Mauger patent is, in this field, a pioneer patent, entitled to a broad and liberal construction.  The present suit is grounded on that view, which was rejected by the court below.

Plaintiff's counsel has urged this contention with great ability; but we are forced to the conclusion that the record does not sustain his highly ingenious argument.

We turn to the Mauger patent.  In the specification it is set forth:

"In water gauges, as heretofore constructed, considerable difficulty and expense in maintenance has arisen owing to the likelihood of the glass becoming broken when the same is adjusted to overcome leakage at different points along the glass, since such adjustment places nonuniform pressure upon the glass, so that breakage of glasses occurs, owing to such adjustment and to the expansion and the contraction of the glass itself."

The specification then sets forth that the inventor has designed a novel construction to overcome these objections, with novel means for securing the glass between the gauge frame proper and the sight member, as well as a novel construction permitting longitudinal movement without affecting the sealed condition of the gauge.  The specification

then describes, with references to the drawings, a gauge consisting of an apertured front or sight member, with a back member containing a pipe connected with the boiler; between the two members the grooved glass is placed; the three parts are then fastened together by a yoke. This fastener is the gist of the alleged invention. This yoke is stated to be "located preferably centrally on the sight member," with an adjusting screw in the back, so that, when the adjusting screw is tightened, the yoke or clamp gripping into recesses in the forward face of the front member will draw the glass tightly against the packing between it and the front and back of the glass, "so that the glass will be secured in fluid-tight conditions relatively to" both casings.

The specification proceeds:

"*Special attention* is directed to the fact that the means employed for securing the parts in assembled condition comprises *only a three-point contact*, consisting of the extension 19, of the yoke or clamp 18, engaging in the recess 20, and adjusting screw 13, engaging in the recess 12, it being seen that the forward end of the *screw 13* is preferably rounded or of conical formation to coact with the bottom of *the recess 12*. The point of the *screw 13* will automatically center itself in the recess 12, as is apparent.

"It will be apparent that owing to the novel manner in which the glass is secured in assembled position with respect to the casing and the sight member that longitudinal movement of the glass will be permitted, so that the glass will seat upon the gasket and a fluid-tight seal will be formed with the casing." (Italics ours.)

Further:

"If leakage occurs at any point along the glass, it is simply necessary to adjust the set screw 13, whereupon the glass will be drawn into proper engagement with the packings 10 and 24, without distorting the glass and placing a nonuniform pressure thereon at different points."

The specification thus plainly shows that the inventor was relying on the three-point contact of a single yoke to provide the automatic adjustability of pressure upon the different parts of the gauge, so as to obviate the difficulties arising both in the original construction of such devices and from the movement due to the unequal expansion of glass and metal under widely varying degrees of heat. The same fundamental notion is reiterated in the claims. Claim 5 is referred to by both counsel as being perhaps the broadest and most typical. It reads:

"In a water gauge, a casing having an open side, a glass closing said open side, an apertured sight member for said glass, a packing between said casing and said glass, a packing between said glass and said sight member, *a yoke embracing* the casing, the glass and the sight member and having its forward ends engaging the sight member, said sight member having means for fixing the position of the ends of the yoke with reference to the sight member, and *an adjustable fastening* device coacting with said yoke and said casing." (Italics ours.)

The claim refers to "a yoke"—i. e., one yoke—and it also shows, what was not pointed out above, that the sides of the Mauger gauge would be open, not covered in by a box or casing. This open side feature is referred to in every one of the six claims. It seems to have been regarded by the patentee as an essential part of his invention, on the theory that thus there would be a freer movement for expansion and contraction.

Emphasis is lent to the view necessarily derived from examination of the patent itself—that Mauger's invention was limited to a single yoke, the three-point contact principle—by consideration of the history of the patent as shown in the file wrapper. In his original application Mauger provided:

"In some cases I may employ two yokes, thus having four points of contact on the sight member and one point of contact on the casing."

Obviously, this does not, as both counsel agree, mean two yokes. It means one duplex or compound yoke. Otherwise there would have been, not "one point of contact on the casing," but two points of contact on the casing.

But the Examiner objected that this construction "should be illustrated, or else said lines should be erased." And Mauger, without discussion, canceled the lines, thus showing that the very essence of his idea was the single yoke, adjustable by a single screw, in the rear of the gauge.

The file wrapper contains other matters, in relation to claims allowed and disallowed, all leading to the same conclusions: The patent sought and the patent granted was limited, and intended to be limited, to the three-point contact, one yoke.

We turn now to the gauges in commercial use, and to the alleged infringing devices. At the outset it is noteworthy that neither plaintiff nor defendant has ever put upon the market a gauge with a single yoke. All the yoke-fastened commercial gauges shown to us have at least three yokes. So far as appears, no gauge made in accordance with the drawings and specifications of the Mauger patent has ever been marketed or used. It seems to be only a paper patent.

But the crucial question is whether the defendant's gauges are an infringement of the Mauger patent, assuming for the moment this patent to be valid. We accord with the court below in his finding that there was no infringement.

The defendant's gauge is not altogether easy to describe in detail, without loading this opinion down with illustrating drawings, which seems hardly necessary. But we point out some of the vital differences between it and the gauge described in the Mauger patent.

Defendant's gauge, as it appears both in drawings and in the models presented, is a very different device from that covered by the Mauger patent. While it uses the old yoke method of fastening, it has three yokes, not one yoke, and these yokes are attached to the front member in a radically different way from that described in the Mauger patent. On each side of the front are six lugs, or ears, running back upon a shoulder attached to the side of the back member. Through these lugs, and through holes in the end of each of the yokes, runs a detachable rod, so that, by loosening the nuts on the yokes in the rear of the gauge, the rod can be withdrawn and the gauge opened up for cleaning, repair, or for substitution of a new glass. In Mauger's patent, the ends of the yoke grip into the face of the front member, thus giving that member a spreading or lateral pull, avoided, as is fairly claimed, by these shoulders on the sides of defendant's device.

Repeating (for the sake of clarity) that a single yoke with a three-point contact is the essence of the Mauger invention, we find in the defendant's device three yokes with at least nine points of contact. In one aspect, as each of the three yokes transmits its pull through the rod to two lugs attached to the side of the front member, there are six contacts on each side of the front member, twelve on the two sides, and thus in all fifteen contacts, as contrasted with the three-point contact of the Mauger patent. Another difference is that, in the defendant's gauge, the front member is interfitted with the back member, so as entirely to inclose the glass, and thus, as is claimed, lessen the danger to breakage of the glass, or of injury if a defective glass should explode. The Mauger patent emphasizes its open-side feature.

The plaintiff's combination is for an open-sided holder, fastened by one, and only one, yoke, so as to get on one point in the rear the full effect, lateral and longitudinal, of the microscopic rocking movement claimed to be necessary in order to equalize pressure in original installation, and to permit the free movement required by expansion and contraction in operation. The defendant's combination is for a close-sided holder, with three yokes, which gives it, at three rear points, lateral play for this rocking adjustment. It thus perhaps avoids the inequalities of pressure accruing from the bolt-fastened box of the old type; but with three points of contact in the rear, and six or twelve on the front member, longitudinal adjustment by rocking is greatly limited, if not entirely destroyed. The two devices are different in structure and in operation.

With such radical differences in structure and in the functional operation of the yoke-fastening devices, it is clear that the defendant's device cannot be held an infringement of the Mauger patent, unless that patent be, under an extraordinary extension of the doctrine of equivalents, construed as covering any and all applications of the old yoke-fastening device to such gauges, including the use of two or more yokes, because one yoke will not perform the work set for it in the Mauger patent. No such extension of the doctrine of equivalents is warranted. The case does not, on the issue of infringement, fall within the doctrine laid down by Judge Brown in Brown & Sharpe Mfg. Co. v. Starrett Co. (D. C.) 225 Fed. 993, 996, the case cited and relied upon by plaintiff.

The doctrine of equivalents is not applicable to this case; for, as already indicated, in such a combination, two or more yokes function in a manner radically different from that which obtains in the case of one yoke. Mauger taught, if anything, that with one yoke in such a combination a result would be achieved closely analogous to that which arises when one yoke with the three-point contact is applied to the circular fruit jar cover. He did not teach that two or more yokes, substituted for bolts, would avoid the difficulties found in the old type of gauge. Of course, yoke fastening devices are old, much older than steam gauges. Merely to substitute several yokes for bolts was, if invention at all, not what Mauger discloses in his patent. He thought, and said in legal effect, that with *one* yoke only the stiffness of the frame would be adequate to "overcome leakage at different points along

the glass," while giving full play to the free rocking movement, lateral and longitudinal, on the single point contact in the rear. The moment two or more yokes are substituted for one yoke, a different device, functioning differently, is created.

We limit our decision to holding that there is no infringement. The court below said:

"In my opinion the Mauger patent is void for lack of invention. But, if the patent shows sufficient novelty to be patented, it should be limited to mechanical details shown therein, and is not infringed by the defendant's gauge in which the mechanism is quite different."

We agree with the latter part of this finding. We regard it as unnecessary and undesirable for us to discuss the prior art, or to undertake to determine whether the Mauger patent is void for lack of invention. Cf. Atlantic Works v. Brady, 107 U. S. 192, 199, 2 Sup. Ct. 225, 27 L. Ed. 438. On the record before us we cannot—and do not —say that a water gauge, probably much smaller than those put before us, and commonly used on locomotives, and perhaps subjected to less pressure than obtains in locomotive boilers, with a single yoke and a three-point contact, might not be useful. Nor do we say that the Mauger patent, construed in the light of the prior art, might not, within narrow limits, be held valid.

But we do hold, as did the court below, that the Mauger patent does not cover the gauges manufactured and sold by the defendant.

The decree of the District Court is affirmed, with costs in this court to the appellee.