## DYER v. SOUND STUDIOS OF NEW YORK, Inc.

## No. 1013.

District Court, D. Delaware.

Oct. 11, 1935.

Samuel E. Darby, Jr., of New York City, and E. Ennalls Berl, of Wilmington, Del., for plaintiff.

Stephen H. Philbin (of Fish, Richardson & Neave) and F. T. Woodward, both of New York City, and William G. Mahaffy, of Wilmington, Del., for defendant.

NIELDS, District Judge.

The bill charges infringement of three patents issued to plaintiff relating to phonograph records and the production thereof. The patents and the claims involved are: No. 1,570,297, granted January 19, 1926, on application filed May 7, 1923, claims 4,

.5, 6, 8, 11, and 12; No. 1,726,546, granted September 3, 1929, on application filed October 19, 1927, claims 1 and 2; No. 1,-783,498, granted December 2, 1930, on application filed October 19, 1927, claims 1 and 7. The defenses are (1) invalidity of all three Dyer patents, and (2) noninfringement of the first patent.

This controversy centers principally upon the first Dyer patent listed above, No. 1,570,297, covering a "microscopic" phonograph record. Claim 4 is typical of those relied upon, and reads as follows: "4. In the art of reproducing sounds, a talking machine record having a microscopic groove in width, length and amplitude as compared with existing practice, the values of width and length being so chosen as to permit the recording on a ten inch disc of sounds extending over a period of ten minutes or more, a needle engaging the record groove with a pressure sufficiently light as not to result in substantially greater wear than with existing practice, and means for securing an amplified response from said needle, substantially as set forth.".

The other Dyer patents relate to apparatus and means for making the phonograph record above described. A characteristic claim of No. 1,726,546 is: "1. An apparatus for recording sounds of long duration comprising in combination, two turntables for receiving alternately successive records each representing a fraction of the sounds to be recorded, an electrical pickup mechanism co-operating with the record on each of said turntables, whereby the sounds recorded on said records will be converted into telephone currents, a third turntable rotating at a substantially reduced speed, a micro-blank thereon, and magnetic recording mechanism operated by the telephone currents for forming a groove in said micro-blank, substantially as set forth."

A typical claim of patent No. 1,783,498 is: "1. The method of recording sounds of long duration which consists in making successive records, each representing a fraction of the sounds to be recorded and in electrically transferring the recorded sounds from the successive records to a micro-blank turning at slower speed than the original records, substantially as set forth."

It may not be amiss at this stage to suggest the principles of recording or making phonograph records and of reproducing or playing them. The record is made by sound waves causing a diaphragm to vibrate; the diaphragm being connected to a cutting needle or stylus so that the latter vibrates in the record to produce the sound track. In acoustic recording, the diaphragm is connected directly to the stylus, while in electric recording the diaphragm's movements produce electric currents which are amplified and then actuate the stylus. The record is reproduced or played by having a needle follow the groove in the record, causing the needle to vibrate in accordance with the variations of the grooves. The needle may be arranged to communicate these vibrations, either directly or through an electrical connection, to a diaphragm. The frequencies of the recorded sound, of the vibrated needle, of the corresponding electric currents, of the diaphragm, and of the resulting sound waves, are identical. These principles of recording and reproducing sound were common knowledge in the industry many years before Dyer.

Plaintiff is a patent attorney and draftsman of patents of long experience. He early exhibited an interest in electrical inventions. In 1888 he had a hand in setting up a phonograph presented by Edison to the Emperor of Korea. In 1891 he leased an Edison phonograph and for two years experimented with it in his law office. For 15 years, between 1897 and 1912, he was closely associated with Edison, part of the time occupying the same office in Orange, N. J. He had charge of Edison's patent work and prepared his applications for patents. He became president of the Edison Companies; the principal one manufacturing phonographs. In 1912 he resigned from the Edison Company. Since then he has practiced the profession of a patent expert. At the hearing Dyer testified that in 1920 he was employed as an expert in patent litigation respecting phonographs and made a number of experiments "which convinced me that my present invention was practical." It may not be without significance that in this same year Admiral Fiske employed him as attorney to file a patent application embodying the idea that written matter could be reduced to microscopic dimensions so that it required a magnifying glass to read it. This patent states that the master record is reduced by photographic means to obtain "an enormously reduced image of the

original master" and the "small and preferably microscopic characters * * * may be properly magnified so as to be easily read." The same basic idea was followed by Dyer in his microscopic record.

In May, 1923, Dyer filed his application for a patent on a record having a "microscopic" record groove whose sounds "may be amplified in any suitable way," as, for example, by vacuum tube amplifiers. This application resulted in the first patent in suit. In April, 1924, about a year after filing this application, Dyer made for the first time a microscopic record embodying the teachings of his patent. This record was played during the trial with unsatisfactory results. Its scratch noises were such as to make it commercially impractical, as Dyer admitted at the hearing. In May, 1924, Dyer demonstrated this microscopic record before engineers of Western Electric Company. That company had been making long-playing records for some time. After investigation, the engineers decided that the Dyer record was not commercially practicable. In 1925 he endeavored to interest the Aeolian Company and the Victor Company in his microscopic record. These companies made some experimental records, but no commercial records. In 1926, after his patent had issued, Dyer persuaded the Edison Company to manufacture a record with 450 lines to the inch. These records were not put out for more than a year or two, and were, to quote Dyer, "a total failure." So in 1926, after having the benefit of the Western Electric, Aeolian, and Victor experiments and the aid of the Edison Company, he was unable in following the teachings of his patent to produce a satisfactory long-playing record.

In 1928, a license under the Dyer patents was sold to Acoustic Products Company for $70,000, of which $40,000 was paid to Dyer. Acoustic Products failed in 1930, and there is no clear proof that it ever made any records under the license. Plaintiff's counsel read an article from a newspaper to the effect that some records were broadcast which had been made under the personal direction of the engineer for Acoustic Products Company; but a witness produced at the hearing who supervised the recording done by Acoustic Products and was familiar with practically all that was done by it testified he knew nothing of the making of any commercial records by Acoustic Products Company, although some experimental records were made. If that company had ever made any commercial broadcast records, the plaintiff as licensor should have been able to offer some proof of it. Finally, there were the long-playing records made a few weeks before the hearing, none of which had been sold. It is clear that Dyer contributed nothing useful to the commercial art. In other words, for all practical purposes this Dyer patent is a paper patent.

A word about defendant. Defendant was organized in 1929 for the purpose of making broadcast records. It began manufacture by putting out 16" records with 7½ to 10 minutes' playing time. As many advertisers have 15 minutes of the radio hour, defendant in 1931 followed its competitors and manufactured a 15-minute record. This is the common practice to-day with the large number of companies making broadcasting records. It is stipulated, however, that Electrical Research Products, Inc., owned by Western Electric Company, is defending this suit.

Until science afforded appropriate means for amplifying sound, the outstanding defect of a phonograph record was the short duration of playing time. This limitation crippled the phonograph industry. The purchasing public did not want to jump up at the end of every 3 or 4 minutes to change the record and adjust a new needle. The mechanical device for removing one record and substituting another was a noisy makeshift that failed to provide agreeable continuity of sound. Upon the advent of the radio broadcast with its unbroken entertainment, the phonograph industry languished; yet the great pioneers of the industry were keenly alive to its limitations and were intent upon providing a long-playing record. The key to the solution of the situation was the vacuum tube amplifier. Back in 1913 De Forest amplified weak sounds recorded on a telegraphone wire by means of a vacuum tube amplifier. In his British patent he stated that instead of the telegraphone, which was one form of a sound record, there may be used "any other convenient source." Several inventors applied this knowledge to the development of the phonograph before Dyer. Their work will be referred to later in this opinion.

We come now to a consideration of the terms of the first patent. In 1923 when

Dyer filed his application for the patent he had been out of the business of manufacturing phonographs for nearly ten years. As a matter of "pure reasoning," he says, he evolved his record. Dyer, like many others, desired to produce a long-playing record. "What I propose by my present improvements, is to very greatly extend the capacity of a record of the present standard size by obtaining thereon a record of sounds of an hour or more representing an extension of 25 fold as to time." By standard size Dyer meant a disc record of 10 or 12 inches in diameter. There was nothing patentable in the broad idea of a record that would play a long while. The only patentable idea would be a way of accomplishing it, provided the way was novel and rose to the dignity of patentable invention.

What way of accomplishing a long-playing record is afforded by the patent? Dyer states in his patent that he makes "a record groove of microscopic size, preferably of the order of .001 inch in width," i. e., one-fifth the existing practice. Next, the surface speed is reduced to one-fifth, from 40" to 8" per second. Next, the amplitude, i. e. the depth or lateral displacement of the recorded vibrations in the groove is reduced to one-fifth, from .001 to .0002 of an inch. Next the pitch, i. e., the spacing of grooves per inch is reduced to one-fifth, from .01 to .002 of an inch, or, expressed differently, Dyer prescribes 500 instead of 100 grooves per inch. The patent gives specific instructions as to performance as well as dimensions. It states: "Such a record as I have above proposed, could not be used effectively for direct reproduction; * * * direct reproduction under any circumstance would be weak, owing to the limited amplitude of the recorded sounds. * * * by suitable amplifying means I increase the volume of the sounds to the desired extent." The Dyer record having a microscopic groove requires for effective use some suitable means for amplifying sound such as a vacuum tube amplifier; otherwise, it is admittedly useless.

Thus a reduction to one-fifth of the dimensions of existing practice is recommended, although the patent also states: "It is of course not necessary that these dimensions shall be precisely followed; by reducing the width of the groove and proportionately reducing the surface speed

the time of reproduction is increased in proportion to the product of the two factors; a record of one-third the usual width and one-third the speed will represent a nine-fold increase in time, and so on. It is important that there should be a substantial reduction in the width and surface speed as compared with present practice, since the opportunity of exterior amplification is practically unlimited. * * *" However, the teaching of the patent is that a reduction to one-fifth the existing practice is preferable and should be made. Obviously, Dyer could not lay claim broadly to a long-playing record or even to a long-playing record with amplifying means. The specific way of accomplishing a long-playing record suggested in the patent is a general reduction of the factors of reproduction to one-fifth the existing practice.

The ideas suggesting the reductions are perfectly simple and obvious. The more grooves the longer the playing time is one idea. By reducing the width of the grooves more grooves can be placed on a record is another idea. With the groove width reduced, the groove amplitude is also reduced. The longer the needle travels in the groove the longer the record will play. With sounds faint or inaudible as a result of these reductions the use of an amplifier, such as a vacuum tube amplifier, is obvious. No new and unexpected result is obtained. Moreover, Dyer secured a patent that has proved of no commercial use.

Turning to defendant, in what way does it accomplish a long-playing record? Three phonograph records of the type manufactured and sold by defendant were produced and played at the hearing. These records are 16" in diameter. They have a playing time of about 15 minutes. A transcription of the same selection appears on both sides of each record. On one side is a vertical cut and on the other side a lateral cut. The space about the center without grooves or threads is from 6.80" to 7.56" in diameter. Some of defendant's records have 114 threads or grooves per inch, and the others 129 threads or grooves per inch. The width of the groove is from .006 of an inch to .0077 of an inch. The maximum amplitude for the lateral cut records ranges from .0009 to .0013 of an inch. The maximum amplitude for the vertical cut records is

.002+ of an inch. The rotary speed of the record or disc is 33.33 revolutions per minute. The pressure on the needle in the vertically cut record is from three-fourths of an ounce to one ounce. Customers of defendant reproduce these records by employing an electrical pickup. A pickup generates telephone currents which are amplified by means of thermionic amplifiers. When amplified the currents modulate the carrier current of a radio broadcast transmitter.

What was the state of the phonograph art in 1923? The principal factors in phonographic reproduction are: (1) Grooves per inch; (2) groove width; (3) amplitude of groove; (4) speed of recording; (5) electric amplifiers; (6) needle pressure; (7) size of record and playing time. I shall consider these characteristics as they are exhibited in the prior and contemporary art in the above order.

Grooves per inch. Records of more than 100 lines to the inch were well known to the art prior to Dyer's application in 1923. Edison patent 964,221, applied for in 1907 and granted in 1910, describes a record with "preferably a pitch of two hundred threads per inch." The standard Edison record from 1913 to 1931 had 150 lines. Fletcher patent 1,269,696, applied for in 1915 and granted in 1918, has 184 lines. Jones & Harris patent 1,425,018, applied for in 1916 and granted in 1922, discloses 300 lines. British patent 107,321 of 1917, for an improvement on the then common Edison disc record proposes 450 lines. Thus it appears that the idea of using 300 and 450 lines was old, and that defendant's records have only 114 and 129.

Groove width. Small groove widths were known to the art before Dyer. Edison patent 964,221 (ante) proposes making the width of the groove only ½ its present dimension, i. e., ½ of .005 of an inch. Packman patent 1,250,637 applied for in 1910 and granted in 1917 proposes grooves of "a minute width." Fletcher patent (ante) has a lateral groove width of .002 to .003 of an inch. Jones & Harris (ante) has a preferred width of .001 and a narrower width of .00075 of an inch. The British patent of 1917 (ante) had a groove width of .005 and proposed a reduction to one-third or .00166 of an inch. Defendant's records have groove widths from .006 to .007 of an inch. It thus appears that defendant has grooves wider than

the prior art stated in the Dyer patent of .005 of an inch.

Amplitude. Amplitude of groove is a very important feature of phonographic recording and reproduction and requires some definition. In a laterally cut record, the stylus will cut a spiral of uniform depth which will undulate from side to side in accordance with the actuating sound waves. In a vertically cut record the stylus will cut a spiral of varying depth, the variations in depth corresponding to the actuating sound waves. In both cases, the greater the sound waves, the greater the undulations or amplitude. The amplitude is measured by the distance from the average or centre line to the outer limit of the movement. The larger the amplitude or swing the greater the loudness.

Without electric amplifiers, Dyer declares the existing amplitudes were "between .001 and .002 of an inch." But the art knew that smaller amplitudes than .001 could be used. MacDonald patent 714,651, applied for in 1898 and granted in 1902, speaks of amplitudes "seldom more than one two-thousands of an inch in amplitude" which is .0005 of an inch.

Dyer proposes an amplitude of .0002 of an inch. He says "with my improved record the recorded amplitude will be approximately .0002 inch." And, further, "The sounds recorded in the groove differ only from the sounds in the grooves of existing records in the respect that they are of less amplitude, but otherwise they are perfectly and accurately formed." This amplitude is too small for effective reproduction unless amplifiers are used. Dyer states: "Such a record as I have above proposed, could not be used effectively for direct reproduction; a sound box for that purpose would have to be too heavy and direct reproduction under any circumstance would be weak, owing to the limited amplitude of the recorded sounds."

There is nothing novel in suggesting the recording of sounds so weak that electric amplifiers must be employed. We have seen that in 1913 De Forest recorded weak sounds and in reproducing them brought the sounds up to the desired volume by employing vaccum tube amplifiers.

Speed. To cut the sound waves into the record the record must move at some rate of speed. If the speed is too slow, the sound waves will be so crowded together that the reproducing needle cannot

follow them. The linear speed of the needle will decrease as it travels from the outside to the inside of the record. The speed at the outside groove of a record is much greater than at the innermost groove, how much greater depends upon the size of the record. The controlling factor is the speed at the innermost groove. If the sound is unsatisfactory at the centre because recorded too slowly, increasing the diameter of the record will not help matters.

Dyer states that "a mean surface speed in the neighborhood of 40 inches per second" is found desirable in practice and he proposes a one-fifth reduction to "a mean surface speed of the order of eight inches per second." The teachings of the prior art are at variance with this statement. MacDonald patent 714,651 refers to standard speeds of about 9.7 to 11.6 inches per second for cylinder records, but 27" per second is preferred. The Amberol Edison record refers to a standard speed of about 18" per second. It discloses knowledge of speed as low as 9" per second. Also, before Dyer, the Berliner and Victor records suggest minimum speeds from 15.6" down to 8.5" per second. Compare these with defendant's records having a minimum speed of about 12" per second and a mean speed of about 20" per second. Dyer's testimony that "anybody that did not believe in high speed was an outcast" would include MacDonald, Berliner, the Victor Company, and Edison among the outcasts.

Amplifiers. The use of electric amplifiers to bring recorded sounds up to the desired volume was not new with Dyer. We have noted that De Forest amplified weak sounds recorded on a telegraphone wire as early as 1913. In his British patent of 1914, De Forest says: "This invention relates to a method of and apparatus for reproducing recorded sounds in an amplified degree of the kind in which the electrical pulsations are generated from the recorded sounds to be reproduced and thereafter amplified." Nicholson patent 1,525,823, applied for in 1919 and granted in 1925, shows in one figure a phonograph record with electric pick-up and vacuum tube amplifiers. To be sure this patent issued nearly two years after Dyer filed his application. It is cited primarily to show the state and progress of the phonograph art in 1923. Jones patent 1,531,253, applied for in 1921 and granted in March,

1925, has a phonograph record with electric pick-up and vacuum tube amplifiers, so that the sounds can be "thrown out to an audience at great volume." The Egerton patent 1,454,157, applied for in 1918 and granted May 8, 1923, discloses a phonograph record with electric pick-up of another Egerton patent and vacuum tube amplifiers. It should be noted that this patent issued on the day following the Dyer application. Meissner patent 1,604,130, applied for in this country in 1922 and granted in 1926, covers a "method of recording and reproducing sound." It states: "When the record is made, the stylus is caused to make only slight movements, such movements being so small that the resultant grooves are insufficient for audibly reproducing the sound intensity. * * * Electrical amplifying arrangements are provided for producing sound of the desired intensity." These patents, like Dyer, require electric amplifiers to be heard. But defendant's records do not require electric amplifiers. This is an essential difference. At the hearing defendant's records were acoustically reproduced. However, they are sold for use in broadcasting stations which employ electric pick-up and amplifiers to modulate the radio wave at the station and not to amplify sounds that could not be heard otherwise.

Pressure. Needle pressure has nothing to do with long playing. The Dyer patent does not claim it, and there is no testimony that pressure bears any relation to long playing. Pressure affects the life of the record, and that is all. Dyer proposes "a pressure of from one-quarter to one-half an ounce." The prior art taught that excessive pressure was undesirable. Wolke patent 1,007,407, applied for in 1908 and granted in 1911, points out that "a stylus mounting of the least possible inertia is very desirable." Catucci patent 1,251,340 provides a needle mounting "for adjustably relieving the sound box needle of a portion or all of the weight of the tone arm." The adjustable spring 24 of Catucci performs the same function as the adjustable spring 23 of Dyer. The minimum weight of the pick-up in the Egerton patent 1,284,623 is about one-half to one-third of an ounce. A pick-up of this weight is used with all the present-day electric phonograph recording and reproducing. Defendant employs between three-fourths to one ounce

for vertical records, and for lateral records between three and four ounces. Acoustic reproducers did not have as light pressures as electric reproducers, yet long before Dyer phonograph records were operated with electric pick-ups and vacuum tube amplifiers. If the needle follows the groove and its vibratory motion is sufficient to drive a diaphragm, increasing the pressure on the needle will not increase the vibrations or the movements of the diaphragm. Increasing pressure increases the wear on the record and does not affect either quality, volume, or surface noise. Dyer contributed nothing novel to the combination of phonograph record, electric pick-up and vacuum tube amplifiers.

Size of record. By "standard size" Dyer probably meant a disc record of 10" in diameter because that is the diameter specified in his claims 4, 5, 6 and 8. But defendant's records are 16" in diameter and are made to play 15 minutes. They contain more playing surface and naturally play longer than the old records. If defendant's lateral records were reduced from 16" to 10" the playing time would be 4.7 minutes. A similar reduction in defendant's vertical records would result in a playing time of only 5.5 minutes.

Defendant's records play longer than some of the prior art records. But Dyer has no patent on a long-playing record as such. He has claims on a microscopic record combined with amplifiers, but defendant's records do not have his 500 lines per inch, his groove of microscopic size, his microscopic amplitude, or any of the microscopic dimensions of his patent. The increase in playing time obtained by defendant's records is due to their greater size and to utilizing the most effective portion of the surface for recording.

A summary statement of the foregoing matter tabulated in four columns gives a bird's-eye view of the situation.

| | 1.<br>Proposals<br>of Patent | 2.<br>Art recited<br>in Patent | 3.<br>Art proved at trial | 4.<br>Defendant's practice |
|---|---|---|---|---|
| Grooves per inch | 500 lines per inch | 100 lines per inch | 200—Edison 964,221<br>150—Edison Diamond<br>184—Fletcher<br>300—Jones & Harris<br>450—Edison (British) | 129 lines in vertical record<br>114 lines in lateral record |
| Groove width | .001 of an inch | .005 of an inch | "1/2 present dimen."—Edison<br>"Minute width"—Packman<br>.002 or .003—Fletcher<br>.001—Jones & Harris<br>.00166—Edison (British) | .006 to .007 of an inch |
| Amplitude of Groove | .0002 of an inch | .001 to .002 of an inch | .0005—MacDonald | .0009 to .0013 of an inch, lateral record<br>.002 of an inch, vertical record |
| Speed of recording | 8 inches per second | 40 inches per second | 9.7" to 11.6" per second (9" is preferred)—MacDonald<br>18" per second (discloses knowledge of 9" per second)—Edison Amberol<br>15.6" to 8.5" per second—Berliner & Victor | Minimum speed 12" per second<br>Mean speed 20" per second |
| Needle pressure | 1/4 to 1/2 of an ounce | Many thousand pounds per square inch | "Least possible"—Wolke<br>"Relieving needle of weight"—Catucci<br>1/2 to 1/3 of an ounce—Egerton | 3/4 to 1 ounce, vertical record<br>3 to 4 ounces, lateral record |

A comparison of columns 1 and 4 is a demonstration that defendant did not use the expedients proposed in the Dyer patent. Defendant's grooves are not the microscopic grooves of the patent, because they are wider than the grooves stated in the Dyer patent to be old. Defendant's grooves have amplitudes as great or greater than those disclaimed in the Dyer patent as old. Defendant's records do not produce the feeble currents obtained from the patented device, but are capable of direct mechanical reproduction through a horn as proved at the trial. It follows that defendant does not infringe this Dyer patent.

Second and third Dyer patents.

The second Dyer patent, 1,726,546, and the third Dyer patent, 1,783,498, have the same disclosure. The second patent has apparatus claims and the third method claims for making phonograph records or "micro records" such as are disclosed in the first Dyer patent. Every claim in the second and third patents is for the making of a "micro-blank" or "micro-master," from which pressings can be taken. The patents describe old methods for making records. The alleged invention is the use of these old methods in making a microrecord. There is no suggestion of any commercial use of these patents. They are paper patents.

These patents describe a process for making a record from one or more other records. A record is played with the usual electric pick-up producing electric currents which are amplified and which energize the usual electric recording stylus. In turn the stylus cuts the sound waves in the blank record. After a record is copied on the blank its turntable stops and the turntable of another record commences to rotate. The electric pick-up of the turntable system of the first record is disconnected and the electric pick-up of the second system is connected with the amplifiers.

Copying the contents of one record on to another record was known long before Dyer. The operation merely involves the connection of the playing needle with the recording stylus so the vibrations of the needle will cause similar vibrations in the stylus. The electrical connection of Dyer had previously been disclosed in five other patents. The use of amplifiers in electrical connections did not require invention. Copying the contents of one record on another record with vacuum tube amplifiers was previously disclosed in De Forest, Engl, Reddie, and Townsend. The matter copied might be from one or several records as disclosed in the Kellum and Townsend patents. The use of two turntables instead of one was old in Couade and Dowey. Running the original record at a higher speed than the blank record involves only ordinary mechanical skill. The microblank for the microscopic record of Dyer was disclosed in the first Dyer patent. There is no new discovery or principle in the second and the third Dyer patents. As the Circuit Court of Appeals for the Third Circuit said: "As all parts of Latham's device were taken from the prior art, and as they perform in his device the same functions they performed in the devices from which they were taken, without developing any new functions, we are unable to find invention." Motion Picture Patents Co. v. Calehuff Supply Co., 251 F. 598, 602. Defendant uses old methods to make nonmicroscopic records.

Defendant does not infringe the first patent, and the second and third patents are invalid for want of invention. The patent laws were enacted to reward those who make useful contributions to industry and not to grant monopolies for impractical theories. Atlantic Works v. Brady, 107 U. S. 192, 200, 2 S. Ct. 225, 27 L. Ed. 438.

This opinion contains a statement of the essential facts and of the law applicable thereto in conformity with Equity Rule, 70½, 28 USCA following section 723.

The bill of complaint must be dismissed.