## PATENT TUBE CORPORATION v. SUN TUBE CORPORATION.

### No. 5944.

District Court, D. New Jersey.
Aug. 14, 1939.

Allan L. Tumarkin, of Newark, N. J. (Armand E. Lackenbach and Joseph Hirschman, both of New York City, of counsel) for plaintiff.

McCarter & English and V. C. Enteman, all of Newark, N. J. (Merrell E. Clark and William J. Barnes, both of New York City, of counsel), for defendant.

FORMAN, District Judge.

This is a suit for infringement of Patent No. 2,073,941 issued March 16, 1937 upon an application of November 7, 1935, covering an alleged invention of Stanley Lowen which was assigned to the plaintiff, Patent Tube Corporation.

The patent applies to an hermetically sealed collapsible metal tube of extremely thin metal gauge. Its general appearance may best be understood by contrasting it with the ordinary tooth paste container. The only ostensible difference is in the means by which the contents of the two tubes are evacuated. Tooth paste tubes have a removable and replaceable cap covering an orifice through which the paste may be expelled. The tube herein does not have a removable and replaceable cap, but one end is blocked by a flat disc which is integrated with the wall of the tube. To remove the contents of this tube the disc is torn from the cylinder resulting in permanent distortion of the container.

There is evidence indicating that at the time Lowen entered the field he was a salesman of, and familiar with, collapsible tubes which were used for food products such as coffee and pharmaceutical products like effervescent salts. These tubes prior to filling were more or less cylindrical and closed at one end by an integrated circular cap or disc. After filling, the open end was folded or crimped. To extract its contents it was necessary to cut along the edge of the folded end either with scissors or a knife or to tear the crimped end by hand. This was objectionable in that this procedure usually united the cut or torn edges very firmly, requiring either the insertion of the finger nail or a tool to pry the tube open, or pressing the ends together between the thumb and forefinger to force the edges apart.

With this art as a background, Lowen conceived the idea that it would be more convenient to the user if he could open a container of this type simply with the finger nail provided that there was certainty of localizing or predetermining the line of rupture. It occurred to him that to this end it would be best to attack the opposite end of the tube, that is, the cylindrical end closed by the integrated disc. It appeared to him that since the metal in the tube would be very thin and soft, and would offer little resistance to tearing, the problem could be solved by providing a groove for the reception of the finger nail adjacent to the said disc-end of the tube. This groove would enable one to make the initial rupture with little difficulty, and also guide the line of demarcation, avoiding a zigzag course towards the opposite end of the tube which would likely result in spilling of the tube's contents.

It thus appears that Lowen's contribution to the art, if any, was the addition of an horizontal, indented groove intended to facilitate the opening of the tube. The configuration of this groove, therefore, is the crux of the case. It partially circumscribes the metal cylinder on a plane parallel with its end, and adjacent to the metal cap. The depression has three boundaries or walls. Beginning at the top of the indentation, the first wall or upper wall slants inwardly and towards the bottom of the tube to a point where the innermost wall or second wall begins. The second wall extends downwardly in a

straight course on a plane parallel with the longitudinal surface of the cylinder to a point where the third wall begins. The third wall extends outwardly slanting downwardly to the edge of the longitudinal surface of the cylinder. To illustrate, the outline of an equilateral triangle, with its apex chopped off, would fit into the depression. This depression has this additional feature. There is a gradual thinning of the third wall to the point where it joins the longitudinal surface of the cylinder. By virtue of this thinning there is created at the juncture of the third wall and the longitudinal surface of the cylinder what is alleged to be the weakest point in the tube. It is alleged that at that point rupture will always occur when pressure is applied to the groove with the thumb nail. Furthermore, it is claimed this weakness controls the line of separation when the disc is torn from the cylinder, avoiding a zigzag course which would result in spilling the contents of the tube.

The patent to Lowen contains four claims, and the plaintiff relies only upon claims 1 and 3 in proving its case. These claims are as follows:

"1. A receptacle in the form of a collapsible metal tube including integral end and body structure, said body structure being provided with an indented at least partially inclosing groove, said groove having a side wall (the third wall discussed above) thereof forming a sharp internal angle with the wall of the said body structure, a weakened portion formed at the apex of said angle (the juncture of the third wall and the longitudinal surface of the cylinder) forming a readily rupturable frangible zone.

"3. In a container, a hermetic closure means comprising a soft metal side wall portion provided with an indented at least partially inclosing groove, said groove having a side wall thereof forming a sharp internal angle with said side wall portion, a weakened portion formed at the apex of said angle constituting a readily rupturable frangible zone".

The plaintiff is not a manufacturer of the patented tube. It only grants licenses under the patent. Defendant, however, is a manufacturer of collapsible tubes alleged to infringe the Lowen patent, and has admitted in answers to interrogatories the manufacture and sale of the tubes in question to the Emerson Drug Company, the manufacturer of "Bromo-Seltzer", and to the Bristol-Meyers Company, the manufacturer of "Sal-Hepatica".

Defendant alleges the invalidity of plaintiff's patent, and denies infringement.

Tubes manufactured by defendant are precisely the same as the tubes to which plaintiff's patent refers, excepting the configuration of the groove heretofore discussed. The groove in the defendant's tube is simply a rounded depression which could easily be effected by thrusting a wire horizontally against an upright cylinder by way of contrast, the groove is not divided into three walls as in the plaintiff's patent, and, finally, there is no thinning of the boundary of the groove.

With reference to the validity of the patent defendant cites the patents to Turner, No. 1,719,736 issued July 2, 1929, Wood, No. 136,890, issued March 18, 1873 and Kawasaki, No. 1,542,944 issued August 17, 1921 as being within the prior art field. Each of these patents deals with containers and reveals a weakened annular zone designed to facilitate the opening of the containers and the removal of their contents.

The Turner patent discloses a conventional metal, collapsible tube with a nipple-like projection. The juncture of the nipple and end of the tube is weakened by a die-punching operation to the point that the "nipple may be parted by hand with neatness and dispatch to expose the dispensing orifice".

The Wood patent reveals a flat top rigid container with a circumferential groove designed to facilitate its opening with a knife.

The Kawasaki patent shows a paper pulp milk container, etc. with a weakened annular groove immediately below an integrated cap enabling it to be opened with the finger nail. The patent contains the following statement: "When it is desired to pour the contents of the bottle therefrom, a cut or tear is made at the line of weakness and the closure wall 2 pulled or pried into position to form an opening or may be completely removed. If the cut or tear is made throughout only part of the circumference of the neck the remaining material joining the neck and wall, will serve as a hinge medium. The tearing or cutting of the material may be effected with the finger nail if the material is of a light nature, otherwise a knife or other suitable instrument may be employed for this purpose".

632

Plaintiff admits that at the time Lowen entered the field there were collapsible tubes of its design on the market. It seeks to avoid the effect of this general background, however, by the addition of the groove. It would seem that the prior art has left little to be improved upon, because the above references indicate that plaintiff had the benefit of prior art dealing with grooved collapsible tubes. In order to avoid the consequences of defendant's prior art citations, plaintiff falls upon the presumption of validity following the issuance of a patent strengthened by the fact that these very references were cited by the Patent Examiner in the file wrapper. Plaintiff also seeks to differentiate its patent from the references to the prior art.

■ Of course, a certain amount of judicial persuasion follows the mere issuance of a patent, and that judicial guidance is accentuated when the Patent Commissioner has eliminated the same prior art references as are urged upon the courts. Salt's Textile Mfg. Co. v. Tingue Mfg. Co., D. C., 227 F. 115, 118; MacClemmy v. Gilbert Corset Co., D.C., 221 F. 73, 76; Hale & Kilburn Mfg. Co. v. Oneonta, C. & R. S. R. Co., C.C., 129 F. 598. But such inferences may be overcome as they are not conclusive. Such is the case at bar.

■ Eminently qualified experts in the field of metallurgy have testified in this case, and have disagreed upon the effect of the depression made in the patented tubes. Through Professor Polushkin plaintiff offered in evidence microscopic photographs of these depressions in defendant's tubes intended to reveal that the groove effected a material reduction in the strength of the tubes. These photographs disclose that the normal cylindrical surface, the surface which is not indented, is striated. At the beginning of the groove, however, the striations dwindle into crisscross lines which Professor Polushkin termed, "Luder lines", which indicate the beginning of the destruction or rupture of the metal. On the other hand Dr. Mehl, called in behalf of the defendant, testified that "Luder lines" positively do not occur in tin and that the criss-cross lines indicated only a "twinning" or a shifting of crystals in the tin. He characterized this "twinning" as indicative of the initiation of deformation rather than destruction. Furthermore, he added that this "twinning" of crystals had little to do with the physical properties of the metal. He testified that if any effect was produced it would be perhaps an "imperceptible strengthening effect."

Whether the groove in these tubes of either plaintiff or defendant effect any orientation of rupture or destruction in their walls as evidenced by microscopic analyses is relatively unimportant. We know by our own experiments that it makes no difference to the ordinary user whether the initial rupture is made with the finger nail in the groove, or beyond the groove. In either case there is no perceptible difference in effort required to tear off the disc. And there is nothing unusual about this. The tube is topped with a metal disc of considerable thickness and it must be remembered that the surrounding wall of the cylinder is only $\frac{3}{1000}$ of an inch in thickness. When the pressure of a thumbnail is applied to the wall anywhere in the vicinity of the disc, the contents of the tube and the thick, metal disc hold their rigidity while the thin wall of the tube yields to the pressure of the nail-groove or no groove. Actually, defendant was taken by surprise when Professor Polushkin testified that defendant had created a zone of weakness in the cylinder walls by utilizing a groove. Theretofore, defendant had been under the impression that the weakest area was in an entirely different section of the tube. Friden, in charge of defendant's production, testified that its tubes in production are hydrostatically tested internally every fifteen minutes, and that he has never known of a tube failing at or adjacent this groove. The failures always occurred about one-third of the way up the straight walls of the tubes. Furthermore, there is evidence indicating that too great a weakening of the area constituting the frangible zone would spoil the utility of the tube. Plaintiff's licensee has already experienced production problems in that they are finding difficulty in producing a grooved zone, one wall of which is thinned. Certainly there is nothing unusual about this since the walls of the cylinder are comparable in thickness to about that of a human hair. Any additional thinning would either produce rupture or an inadequate container.

This court is of the opinion that the groove's value is limited. Its purpose can hardly be said to extend beyond an instruction as to how to open the tube. Thus, confined we find no patentable invention therein. It does not reflect that type of

genius meriting patentable protection. The following quotation from Atlantic Works v. Brady, 107 U.S. 192, 200, 2 S.Ct. 225, 231, 27 L.Ed. 438, precludes the claims of plaintiff: "The design of the patent laws is to reward those who make some substantial discovery or invention, which adds to our knowledge and makes a step in advance in the useful arts. Such inventors are worthy of all favor. It was never the object of those laws to grant a monopoly for every trifling device, every shadow of a shade of an idea, which would naturally and spontaneously occur to any skilled mechanic or operator in the ordinary progress of manufactures. Such an indiscriminate creation of exclusive privileges tends rather to obstruct than to stimulate invention. It creates a class of speculative schemers who make it their business to watch the advancing wave of improvement, and gather its foam in the form of patented monopolies, which enable them to lay a heavy tax upon the industry of the country, without contributing anything to the real advancement of the art. It embarrasses the honest pursuit of business with fears and apprehension of concealed liens and unknown liabilities to lawsuits and vexatious accountings for profits made in good faith."

Accordingly, it will be unnecessary to decide the issue of infringement. Since the patent is invalid the suit is dismissed.